# United States Court of Appeals
## For the First Circuit

No. 02-1653

UNITED STATES OF AMERICA,

Appellee,

v.

RUBÉN REYES-ECHEVARRÍA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO
[Hon. Juan M. Pérez-Giménez, U.S. District Judge]

Before

Torruella, Circuit Judge,
Stapleton,* Senior Circuit Judge,
and Howard, Circuit Judge.

José C. Romo-Matienzo, for appellant.
Thomas F. Klumper, Assistant United States Attorney, with whom
H.S. García, United States Attorney, and Sonia I. Torres-Pabón,
Assistant United States Attorney, Chief, Criminal Division, were
on brief, for appellee.

September 22, 2003

* Of the Third Circuit, sitting by designation.

**TORRUELLA, Circuit Judge.** A jury convicted appellant Rubén Reyes-Echevarría ("Reyes") of intentionally conspiring to possess with the intent to distribute more than five kilograms of cocaine and one kilogram of heroin. The district court sentenced him to life imprisonment and a five year term of supervised release. Reyes appeals, claiming that the district court erred in failing to dismiss the indictment, in admitting as evidence a death certificate without sanitation as to the cause of death, and in enhancing his sentence to life without submitting the enhancement factor to the jury.

## I. BACKGROUND

### A. Facts

We recite the facts in the light most favorable to the verdict. United States v. Díaz, 300 F.3d 66, 69 (1st Cir. 2002). According to trial testimony, Reyes operated a drug trafficking organization from 1994 through 1997. Reyes had an agreement with José Alberto Martínez-Torres ("Martínez") to sell cocaine and heroin at various drug points in Southern Puerto Rico, including Santa Isabel, Coamo, El Pastillo, and Salinas. One of Reyes's employees, Carlos Rubert-Collazo ("Rubert"), controlled the organization's daily operations.

The government presented testimony that Reyes was motivated to murder Martínez in the summer of 1996 out of fear that Martínez might murder him or that Martínez's nephews might take

over Reyes's drug points if Martínez -- who was infected with the HIV virus -- suddenly died. Reyes and Rubert met with Daniel Sánchez-Ortiz (a/k/a "Danny El Gordo") ("Sánchez") and José Medina-Cruz (a/k/a "José El Mellao") ("Medina") approximately three times to plan Martínez's murder. In exchange for killing Martínez, Reyes and Rubert agreed to give Medina two-eighths kilogram of heroin and to pay the four individuals a total of $20,000.

On June 11, 1996, Sánchez and Medina, along with two recruits Roberto "Blackie" Báez-Segarra ("Báez") and José "Hershey" Rivera-Segarra ("Rivera"), drove to Martínez's Santa Isabel home. Medina and Rivera changed into black uniforms resembling the Puerto Rico Police Department's Saturation Unit uniform and entered Martínez's house through a door in the garage, claiming they were police officers. After entering, Medina and Rivera fired handguns at Martínez 23 times, striking him twelve times. Martínez died in a hospital at approximately 1:30 a.m. on June 12, 1996.

On the afternoon of Martínez's death, Rubert contacted Sánchez on Reyes' behalf; he requested a meeting between Reyes, Rubert, Sánchez, and Medina. At the meeting, the appellant gave Medina the promised heroin and gave $10,000 cash to Medina and Sánchez. Reyes promised to give them the $10,000 balance later.

After Martínez's death, Reyes assumed control of Martínez's heroin drug points, and in 1997, he gave Martínez's cocaine drug points to Rubert. Reyes continued to operate the

-3-

heroin drug points until his 1999 arrest, selling between 1000 and 2000 bags of heroin per week at each drug point.

### B.  Indictment and Trial

A federal grand jury returned a two-count indictment against Reyes and three co-defendants (Rubert, Báez, and Rivera) for the drug conspiracy and the murder of Martínez.  The government charged Reyes only on Count One, the drug conspiracy.  After a twelve-day trial, the petit jury found him guilty of conspiring to "knowingly and intentionally possess with the intent to distribute" more than five kilograms and more than one kilogram of heroin in violation of 21 U.S.C. § 841(a)(1).  The district court sentenced Reyes to life in prison and to five years supervised release.[1]  He now appeals.

## II.  ANALYSIS

### A.  Motion to Dismiss

Reyes asserts that the district court erred in denying his motion to dismiss.  Prior to trial, Reyes moved to dismiss the indictment; he contended that José Galiani-Cruz ("Galiani") testified falsely before the grand jury when stating that Reyes had admitted to killing Martínez and that the prosecutor should have known the testimony was false.  Consequently, Reyes argued, the indictment was the product of perjured testimony.

---

[1]  The court also imposed a $100 special assessment not at issue on appeal.

Reyes's argument relies primarily on Galiani's testimonial reference to an inaudible audio recording. Galiani stated he had made an audio-tape of Reyes admitting to Galiani his involvement in Martínez's killing. Although the defense repeatedly requested the tape in discovery, the government never produced an audible copy. This led Reyes to conclude that either Galiani lied about the tape or the prosecution improperly elicited testimony about the tape because it should have known the tape was inaudible. In response to Reyes's motion to dismiss, the prosecution stated that the tape had audibility problems and was sent to be enhanced after the indictment's return. Although the tape recording remained difficult to understand even after the enhancement, Reyes was permitted to listen to and review the tape.

We review the district court's refusal to dismiss the indictment for abuse of discretion. United States v. Maceo, 873 F.2d 1, 3 (1st Cir. 1989). We review any challenges based on prosecutorial misconduct before the grand jury under a harmless-error standard. Bank of Nova Scotia v. United States, 487 U.S. 250, 254 (1988). Under the harmless-error standard, we will reverse "only 'if it is established that the violation substantially influenced the grand jury's decision to indict,' or if there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations." Id. at 256 (quoting United States v. Mechanik, 475 U.S. 66, 78 (1986)); United States

v. Flores-Rivera, 56 F.3d 319, 328 (1st Cir. 1995) (stating that "[e]rrors before the grand jury warrant dismissal of an indictment only if such errors prejudiced the defendants" (quotation marks and citation omitted)).

All but the most serious errors before the grand jury are rendered harmless by a conviction at trial. Mechanik, 475 U.S. at 73. "Only a defect so fundamental that it causes the grand jury no longer to be a grand jury, or the indictment no longer to be an indictment, gives rise to the constitutional right not to be tried." Midland Asphalt Corp. v. United States, 489 U.S. 794, 802 (1989).

We adjudge the alleged error before the grand jury harmless. Here, a petit jury convicted Reyes after a 12-day trial. "The petit jury's verdict of guilty beyond a reasonable doubt demonstrates a fortiori that there was probable cause to charge the defendant[] with the offenses for which [he was] convicted." United States v. López-López, 282 F.3d 1, 9 (1st Cir. 2002) (quoting Mechanik, 475 U.S. at 67).

Reyes has failed to establish Galiani's testimony to the grand jury was actually false or that the government was aware it was false. The fact that the government failed to produce an audible recording was not proof that Galiani committed perjury before the grand jury and that the prosecutor was aware that it was perjured testimony. The tape was produced, but remained inaudible

-6-

in part after enhancement.  Without more, we cannot find that there was "prosecutorial misconduct that biased the grand jury in performing its fact-finding function."  See Maceo, 873 F.2d at 3.

Further, the district court's alleged failure to dismiss following Galiani's grand jury testimony did not prejudice Reyes because the grand jury heard other substantial evidence of Reyes's involvement in drug trafficking and Martínez's murder.  See Maceo, 873 F.2d at 4 (affirming the district court's decision not to dismiss an indictment without deciding whether the grand jury witness's challenged statement constituted perjury because there was other competent and material evidence to sustain the charge issued).  Sánchez and Rubert testified to Reyes's involvement in drug trafficking.  Sergeant Reinaldo Rosado testified as to Rubert's admission that Reyes was involved in drug trafficking and the death of Martínez, and he testified as to Reyes's admission that he was involved in drug trafficking.  The prosecutor also presented an exculpatory statement made by Reyes to Sergeant Rosado in which Reyes said he was not involved in Martínez's murder.

Reyes contends that the testimony of the other government witnesses was insufficient to support the indictment because the testimony was inconsistent regarding the details of Reyes's participation in Martínez's death.  For example, Reyes contends that Sánchez's testimony contradicted that of Rubert and Rivera regarding the number of meetings and the way the payments were to

be made for the murder, and that Rivera and Rubert contradicted testimony they had given previously concerning details of the murder contract.

Reyes's alleged errors are rendered harmless because

> [a]n indictment returned by a legally constituted and unbiased grand jury, if valid on its face, is enough to call for trial of the charge on its merits. A court should not inquire into the sufficiency of the evidence before the indicting grand jury, because the grand jury proceeding is merely a preliminary phase and all constitutional protections are afforded at trial.

United States v. Flores-Rivera, 56 F.3d 319, 328 (1st Cir. 1995).

As we have explained before, leaving indictments open to evidentiary challenges "would [mean] that before trial on the merits a defendant could always insist on a kind of preliminary trial to determine the competency and adequacy of the evidence before the grand jury." Maceo, 873 F.2d at 3. Thus, the district court did not abuse its discretion in refusing to dismiss the indictment.

## B. Death Certificate

Next, Reyes argues the district court erred by admitting as evidence a death certificate without the requested sanitation as to cause of death. He argues that without a coroner's testimony or report supporting the certified cause of death, the government failed to prove the cause.

We review challenges to the admissibility of evidence under the Sixth Amendment's Confrontation Clause for harmless error. Manocchio v. Moran, 919 F.2d 770, 783-84 (1st Cir. 1990). The relevant inquiry under this standard is whether the error affected the defendant's substantial rights; that is, whether it prejudiced the outcome of the district court proceeding. Fed. R. Crim. P. 52(a); Ramírez-Burgos v. United States, 313 F.3d 23, 29 (1st Cir. 2002).

Reyes has asserted nothing to lead us to conclude that any error in the presentation of the death certificate caused him prejudice by affecting the outcome of the district court proceedings. In Manocchio, we faced a closer -- but not close -- call where the defendant argued that the decedent's injuries were not the result of the beating he sustained, but due to drug ingestion. Manocchio, 919 F.2d at 783. We found that "[d]efendant could refute the examiner's opinion as to cause of death by presenting the opinions of his own experts." Id. Thus, we held that the introduction into evidence of an autopsy report for the purpose of proving the cause of death, without the personal presence of the medical examiner, did not violate the Confrontation Clause. Id.

The task before us is made simple by the fact that Reyes does not contend on appeal that he would have presented an alternative theory of death had a coroner testified or that such

testimony would have helped his case. Our review of the record does not reveal that the cause of death was ever in dispute, and Reyes does not argue that Martínez died from a cause other than gunshot wounds. The government presented undisputed testimony that Martínez was struck with twelve bullets and died at the hospital several hours later. Reyes presents us with no theory supporting his assertion that a coroner's testimony would have added anything to the jury's determination. Consequently, any alleged error in the introduction of the unsanitized death certificate "was, at worst, harmless error." Id. at 784.

### C. Sentence Guidelines

Finally, Reyes contends that the district court violated his due process rights when it applied the United States Sentencing Guidelines' "murder cross-reference" to enhance his sentence to life without submitting the enhancement factor to the jury for proof beyond a reasonable doubt. See U.S. Sentencing Guidelines Manual § 2D1.1(d). Without a jury finding of accountability for Martínez's murder, the court erred in using the murder to calculate his sentence because taking into account the murder results in a higher mandatory sentence in violation of Apprendi v. New Jersey, 530 U.S. 466 (2000).[2]

---

[2] As part of his argument, Reyes contends that the district court erred when it refused to give an instruction requesting a specific finding after a guilty verdict to determine whether Reyes was culpable for Martínez's death so that the jury could deliberate whether the defendant had participated in the murder beyond a

We review the sentencing court's application of the guidelines de novo and review the factual findings underlying that application for clear error. United States v. Peterson, 233 F.3d 101, 111 (1st Cir. 2000); United States v. Padró Burgos, 239 F.3d 72, 76 (1st Cir. 2000). In calculating Reyes's base offense level, the sentencing court applied the murder "cross reference" because Martínez was killed "under circumstances that would constitute murder under 18 U.S.C. § 1111." The "murder cross-reference" resulted in Reyes's having a base offense level of 43, a level mandating a life sentence.[3]

This Circuit's recent decisions have eliminated Reyes's Apprendi prayer for relief. In a similar case, a defendant convicted of participating in a drug conspiracy was sentenced to life imprisonment after the sentencing court held him accountable for the deaths of four people, even though the defendant did not participate directly in the actual killing of the victims and was not charged with murder in the district court. United States v. Newton, 326 F.3d 253, 265 (1st Cir. 2003). The sentence was

---

reasonable doubt. We can quickly dispose of this challenge because Reyes was only charged with a drug conspiracy; there was no reason for the trial judge to instruct the jury on a crime for which Reyes was not charged.

[3] Under the sentencing guidelines, Reyes's drug offense resulted in a term of imprisonment no less than ten years or more than life, but based on the application of the murder cross-reference, the minimum was increased from a minimum of ten years to a minimum of life.

affirmed because "[a] sentencing court may . . . consider relevant conduct of the defendant for purposes of making Guidelines determinations, even if he has not been charged with -- and indeed, even if he has been acquitted of -- that conduct, so long as the conduct can be proved by a preponderance of the evidence." Id. (quoting United States v. Lombard, 72 F.3d 170 (1st Cir. 1995)). A review of the record shows that there was substantial evidence before the judge, on which he could find by a preponderance of the evidence that Reyes was responsible for the death of Martínez. The testimony of Sergeant Rosado, Sánchez, and Rubert provided a more than adequate basis for the district court's attribution of Martínez's murder to Reyes.

Ultimately, the statutory maximum sentence for the offense with which Reyes was actually charged is life imprisonment. Because Reyes' sentence does not exceed that statutory maximum, Apprendi is not applicable, regardless of whether a sentencing factor increases the mandatory minimum sentence under either the statute or the Sentencing Guidelines. See United States v. Robinson, 241 F.3d 115, 121-22 (1st Cir. 2001); United States v. Caba, 241 F.3d 98, 101 (1st Cir. 2001); Sepúlveda v. United States, 330 F.3d 55, 60 (1st Cir. 2003) (citing United States v. Robinson as "rejecting the argument that when facts found by the judge trigger or increase a mandatory minimum sentence, an Apprendi violation occurs"); United States v. Eirby, 262 F.3d 31, 39 (1st

Cir. 2001) (stating that "the Apprendi doctrine offers no advantage to a defendant who is sentenced to a term less than the otherwise applicable statutory maximum").

### III.  CONCLUSION

For the reasons stated above, we **affirm**.