STRANCH, Circuit Judge,
dissenting.
The Supreme Court has not been shy about instructing appellate courts regarding their jurisdiction to hear an interlocutory appeal from the denial of qualified immunity. The Court has articulated necessary limitations on interlocutory appeals by expressly confining our jurisdiction to abstract issues of law concerning whether a complaint states a violation of a constitutional right and whether that right is clearly established. The constitutional grant at issue here — the Fourth Amendment right to be free from arrest without probable cause — is clearly established. The more particularized point at stake — whether an objectively reasonable police officer would know that he violates Fourth Amendment law if he uses an impermissibly suggestive photographic lineup to establish probable cause for an arrest — is also clearly established. No abstract issue of law remains to be determined.
The dispute presented by the defendants and resolved by the majority in this appeal rests solely on genuine issues of material fact. This court is not empowered to delve into issues of material fact or to review disputes over the sufficiency of the evidence to prove a violation of a clearly established constitutional right. The determination of those ultimate issues has *148 been entrusted to the trier of fact, the court below or the jury, entities whose job it is to view the evidence and make credibility determinations regarding the parties involved. Because we lack jurisdiction and the appeal should be dismissed, I respectfully dissent.
I. ANALYSIS
A. Johnson v. Jones is the Keystone to Qualified Immunity
In Johnson v. Jones, 515 U.S. 304, 319-20, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995), the Supreme Court held “that a defendant, entitled to invoke a qualified immunity defense, may not appeal a district court’s summary judgment order insofar as that order determines whether or not the pretrial record sets forth a ‘genuine’ issue of fact for trial.” A defendant’s appeal is limited to questions presenting a “purely legal issue [of] what law was ‘clearly established.’ ” Id. at 313, 115 S.Ct. 2151. The Supreme Court has made this critical point repeatedly. See Ortiz v. Jordan, — U.S. -, 131 S.Ct. 884, 891-92, 178 L.Ed.2d 703 (2011); Behrens v. Pelletier, 516 U.S. 299, 312-13, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996). In Behrens, the Court explained Johnson as holding
simply, that determinations of evidentia-ry sufficiency at summary judgment are not immediately appealable merely because they happen to arise in a qualified-immunity case; if what is at issue in the sufficiency determination is nothing more than whether the evidence could support a finding that particular conduct occurred, the question decided is not truly “separable” from the plaintiffs claim, and hence there is no “final decision” under Cohen [v. Beneficial Indus. Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949) ] and Mitchell [v. Forsyth, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) ]. See [Johnson,] 515 U.S., at 313-318, 115 S.Ct., at 2156-2158. Johnson reaffirmed that summary judgment determinations are appealable when they resolve a dispute concerning an “abstract issu[e] of law” relating to qualified immunity, id., at 317, 115 S.Ct., at 2158 — typically, the issue whether the federal right allegedly infringed was “clearly established,” see, e.g., Mitchell, swpra, at 530-535, 105 S.Ct., at 2817-2820; Davis v. Scherer, 468 U.S. 183, 190-193, 104 S.Ct. 3012, 3017-3019, 82 L.Ed.2d 139 (1984).
516 U.S. at 313, 116 S.Ct. 834. Supreme Court law also teaches that the right the official is alleged to have violated must have been clearly established in a particularized sense:
“ ‘The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates [the] right.’ The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.”
Brosseau v. Haugen, 543 U.S. 194, 198-99, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (internal citations omitted) (quoting Saucier v. Katz, 533 U.S. 194, 201-02, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (quoting Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987))). Here, the qualified immunity defense is raised to Legenzoffs Fourth Amendment claims.
B. Clearly Established Law on Probable Cause for Arrest
Legenzoff brought claims under 42 U.S.C. § 1983 for arrest without probable cause and malicious prosecution. “Probable cause” is “reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion.” *149 Sykes v. Anderson, 625 F.3d 294, 306 (6th Cir.2010) (internal quotation marks omitted). A police officer has probable cause for an arrest when the facts and circumstances known to him would warrant a prudent person to conclude that an offense has been committed. See Green v. Throckmorton, 681 F.3d 853, 865 (6th Cir.2012). Probable cause is also the essential element in a malicious-prosecution claim, which requires a plaintiff to show that: (1) he was prosecuted and that the defendants made, influenced, or participated in the decision to prosecute; (2) there was no probable cause; (3) the prosecution resulted in a deprivation of liberty; and (4) the criminal proceeding was resolved in the plaintiffs favor. Sykes, 625 F.3d at 308-09. The right to be free from arrest without probable cause was clearly established many years before the events at issue here. Maryland v. Pringle, 540 U.S. 366, 369-70, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003); Malley v. Briggs, 475 U.S. 335, 340-41, 345, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986); Gerstein v. Pugh, 420 U.S. 103, 111-12, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975); Whiteley v. Warden, Wyo. State Penitentiary, 401 U.S. 560, 564, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971); Beck v. Ohio, 379 U.S. 89, 90-91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); Leonard v. Robinson, 477 F.3d 347, 355 (6th Cir.2007); Thacker v. City of Columbus, 328 F.3d 244, 260 (6th Cir.2003); Crockett v. Cumberland Coll., 316 F.3d 571, 579-80 (6th Cir.2003); Klein v. Long, 275 F.3d 544, 550 (6th Cir.2001); Donovan v. Thames, 105 F.3d 291, 297-98 (6th Cir.1997).
Detectives Wells and Steckel of the Canton Township police department contend they are entitled to qualified immunity on both of Legenzoffs federal claims. They argue that they had probable cause to seek arrest warrants for Legenzoff in the Temple and Whipple cases based on identifications witnesses made after they reviewed a photographic lineup containing Legenzoffs photo.
To determine whether the detectives are entitled to qualified immunity for seeking the arrest warrants, the question is “whether a reasonably well-trained officer in petitioner’s position would have known that his affidavit [in support of the arrest warrant] failed to establish probable cause and that he should not have applied for the warrant.” Malley, 475 U.S. at 345, 106 S.Ct. 1092. If so, “the officer’s application for a warrant was not objectively reasonable, because it created the unnecessary danger of an unlawful arrest.” Id. To determine whether the police had probable cause to seek the arrest of Legenzoff, “we consider the totality of the circumstances and whether the facts and circumstances of which [the officers] had knowledge [when requesting the arrest warrant] were sufficient to warrant a prudent person ... in believing ... that the seized individual ha[d] committed ... an offense.” Sykes, 625 F.3d at 306 (internal quotation marks omitted). As long as the facts allow one narrative where “ ‘a reasonable fact-finder could [determine that] no reasonable officer, mistaken or otherwise, could conclude there’s probable cause,’ ” an officer is not entitled to qualified immunity. Romo v. Largen, 723 F.3d 670, 673-75 (6th Cir.2013) (quoting the district court’s opinion) (affirming a district court’s denial of qualified immunity, despite the existence of a narrative where the jury could find probable cause, because the jury could discount the officer’s interpretation of the facts and determine that no reasonable officer would have concluded there was probable cause).
An arrest based on a facially valid warrant approved by the court ordinarily provides a complete defense to a federal constitutional claim for false arrest. Voyticky v. Village of Timberlake, 412 F.3d 669, 677 (6th Cir.2005). Thus, if Legenzoff is to *150 prevail at trial, he must prove by a preponderance of the evidence that in order to procure the warrant, the detectives “knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create[d] a falsehood and such statements or omissions [we]re material, or necessary, to the finding of probable cause.” Sykes, 625 F.3d at 305 (internal quotation marks omitted); Hinchman v. Moore, 312 F.3d 198, 205-06 (6th Cir.2002). “If the affidavit contains false statements or material omissions, we set aside the statements and include the information omitted in order to determine whether the affidavit is still sufficient to establish probable cause.” Sykes, 625 F.3d at 305 (citing Hill v. McIntyre, 884 F.2d 271, 275 (6th Cir.1989) (citing Franks v. Delaware, 438 U.S. 154, 155-56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978))).
C. Clearly Established Law on Suggestive Photo Arrays
Caselaw clearly establishes that identifications of suspects obtained by the police using highly unreliable photo arrays cannot be the sole basis for probable cause. See Gregory v. City of Louisville, 444 F.3d 725, 743-46 (6th Cir.2006); Stansbury v. Wertman, 721 F.3d 84, 90-91 (2d Cir.2013). The Supreme Court has long held that, when evaluating whether a pretrial photographic lineup is unduly suggestive, “each case must be considered on its own facts,” and “convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so im-permissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.” Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968) (construing a due process claim); see also Perry v. New Hampshire, — U.S. -, 132 S.Ct. 716, 726, 181 L.Ed.2d 694 (2012); Neil v. Biggers, 409 U.S. 188, 197, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). Though Simmons, Perry, and Biggers considered suggestiveness in deciding whether lineups were admissible at trial, these and similar cases instruct police officers about the constitutional parameters they must obey to ensure that a photo array shown to an eyewitness does not taint the identification process. The majority undoubtedly agrees with this point given that it bases its analysis almost exclusively on lineup-admissibility cases. Maj. Op. at 141 n. 3, 143-46. Because of this longstanding law, an objectively reasonable police officer would have been on notice long before Legenzoffs arrest in 2008 that a photographic lineup shown to eyewitnesses for the purpose of developing probable cause for an arrest may not be “impermissibly suggestive” as defined by the Supreme Court nor may identifications resulting from such a lineup serve as the sole basis for probable cause.
“Where the reasonableness of an officer’s actions hinge on disputed issues of fact, ‘the jury becomes the final arbiter of ... immunity, since the legal question of immunity is completely dependent upon which view of the facts is accepted by the jury.’ ” Leonard, 477 F.3d at 355 (quoting Brandenburg v. Cureton, 882 F.2d 211, 215-16 (6th Cir.1989)). Here, the district court determined, under clearly established law and construing the evidence in the light most favorable to Legenzoff, that there were genuine issues of material fact for trial on whether Legenzoff was arrested without probable cause. Accordingly, our case falls squarely within Johnson— we lack jurisdiction over this interlocutory appeal because the only issue presented is whether the evidence was sufficient to demonstrate a violation of clearly established law. 515 U.S. at 319-20, 115 S.Ct. 2151; Romo, 723 F.3d at 674.
*151 D. The Factual Record Supports the District Court’s Decision
Understanding why the district court determined that genuine issues of material fact exist for trial on the false-arrest and malicious-prosecution claims requires a review of the factual record. To be clear, there are no “affidavits” signed by Detective Wells and Detective Steckel that were provided to the state prosecutors to support the requests for arrest warrants for Legenzoff in the Whipple and Temple larcenies. To serve the function of an affidavit in each case, the detective submitted a document entitled, “Investigator’s Report,” which provided “Details of Investigation.” The Reports referred only to “the lineup” and “the photo line up” shown to the witnesses and certainly did not disclose that two lineups were shown: a color one and a black and white one. The Reports also lacked any description of “the lineup” and provided no information about the procedures the detectives used to create “the lineup.”
Detective Steckel requested the first arrest warrant for Legenzoff in the Temple case on September 23, 2008. His Investigator’s Report stated that the Temples identified the suspect as an unknown older white male, with gray hair and glasses, standing 5' 7" and weighing 180 lbs. The Report stated: “Det Wells showed the complainants the lineup on 9-23-08. The complainants picked the defendant immediately out of box # 2 and stated that they were 100 percent sure that was the subject in their house.” The Report failed to include any information about the procedures used to show the lineup to the Temples.
From Detective Steckel’s Report, the prosecutor could not have known whether the photographs used in the lineup shown to the Temples depicted individuals with characteristics similar to the suspect described by the Temples, such as the distinguishing feature that the suspect wore glasses. In fact, none of the photos in the lineup depicted individuals wearing glasses. The detectives did not create a lineup based on the Temples’ descriptions of the suspect, but instead used the same lineup that had been created earlier for the Whipple larceny. The Whipples did not describe the suspect as wearing glasses.
On September 25, 2008, two days after Detective Steckel requested an arrest warrant in the Temple case from one prosecutor, Detective Wells requested an arrest warrant in the Whipple case from a different prosecutor. In that Investigator’s Report, Detective Wells stated that the Whip-ples were approached outside a Kroger store by an older white male about two weeks before the larceny at their home and they spoke to him for a short time. On the date of the larceny, however, Mrs. Whipple was not at home and Detective Wells’s Report failed to provide that information. Rather, his Report stated that Mrs. Whipple identified a photo in the lineup — LegenzofPs—as “the person who was in their home.” But Mrs. Whipple could not have identified the suspect who entered the home because she was not present at the time of the larceny. She chose Legenzoffs photo to indicate the person she had previously met at Kroger, though this distinction was not conveyed to the prosecutor. Detective Wells omitted from the Report that the 90-year-old Mr. Whipple reported that he was “really tired” when the larceny occurred, a fact that casts doubt on the reliability of Mr. Whipple’s identification of the suspect. Detective Wells’s Report also failed to inform the second prosecutor whether the lineup photographs depicted individuals with characteristics similar to the suspect described by the Whipples.
*152 Both Reports did not reveal to the two prosecutors that five of the six photos in the lineup were of identical size and showed individuals with darker gray hair against gray backgrounds. The sixth, Le-genzoff s photo, was smaller than the others and depicted his white hair against a bright blue background. Only LegenzofPs photo and one other in the lineup showed men who were neatly dressed, a trait Mr. Whipple had found particularly memorable. The other photos depicted younger men, three in disheveled clothing and one shirtless. Three other local police agencies trying to solve similar larcenies in which Legenzoff became the suspect were able to create photo lineups that were far less suggestive than this one. They used filler photos of mostly neatly dressed, older men with similar white hair color.
The record does not confirm that Detective Wells and Detective Steckel provided either the color lineup or the black and white lineup to the prosecutors when requesting the arrest warrants. Apparently unaware of the problems with the lineup identifications, one prosecutor agreed to seek an arrest warrant against Legenzoff in the Temple case. The other prosecutor denied the request to seek an arrest warrant in the Whipple case.
An initial preliminary examination in the Temple case was continued to allow further investigation by the defense. Immediately after this truncated court proceeding, Detective Steckel approached Legenzoff and his lawyer outside the courthouse and told them that the police department had an additional charge to bring against Legenzoff. He was referring to the Whipple case. Detective Steckel asked Legenzoff to return to the courthouse for an arraignment and bond hearing, but he failed to inform Legenzoff and his lawyer that the second prosecutor had declined to seek an arrest warrant in the Whipple case. Nor does the record indicate that any new evidence linking Legenzoff to the Wdiipple larceny had been developed. Uninformed about these issues, Legenzoff complied with Detective Steckel’s request.
On a later date, Legenzoff faced a preliminary examination in the Temple case, during which his counsel marked the color lineup as Defendant’s Exhibit A. Upon being asked by the judge whether this color photo array was the actual photo lineup used, a third prosecutor who was handling the preliminary examinations stipulated that “[t]his is the actual photo array, Your Honor, correct.” Defense counsel showed Exhibit A to Mrs. Temple and she confirmed that those were the photos from which she had identified Legenzoff. She also testified she felt more confident that she had picked the right person because Detective Wells told her there were other pending cases involving the same suspect. Mr. Temple, too, identified Exhibit A as the photo lineup from which he identified Legenzoff, specifically confirming that the detectives showed him the color lineup first.
During a later preliminary examination in the WTiipple case, Mr. Whipple admitted he had vision problems and he was unable to identify Legenzoff in the courtroom, even though the judge allowed him to walk around the courtroom to look at people. Although Mrs. Whipple was not at home when the larceny occurred, she testified that she was certain Legenzoff was the suspect who stole from them.
Testimony during the preliminary examinations further confirmed that Mr. Temple and Mr. Wfiiipple, having already identified a suspect from the photo lineup, remained in the room with their respective wives as the women reviewed the photo array and identified a suspect. Mr. Whipple reviewed the photo array a second time *153 while his "wife remained in the room after she picked a suspect.
At depositions in this case, each detective testified about the process used for creating lineups. In the Canton police department, an officer creates a six-person photo array using CLEMIS, a computer database shared by numerous Michigan localities. CLEMIS contains only booking photos, so when a lineup is to include a suspect for whom no booking photo exists, the suspect’s driver’s license photo, retrieved from the Secretary of State database, is used. The parameters necessary to create the lineup are inputted manually. Height, weight, age and hair color are all available parameters, but clothing is not, and the officer chooses the parameters for the lineup based on witness descriptions. The officer tries to obtain filler photos as similar to the suspect’s photo as possible, but according to Detective Wells, a bright blue background — like those in driver’s license photos — is distinctive. CLEMIS then creates a lineup with five booking photos; the suspect’s driver’s license photo is imported as the sixth photo. Before the lineup is printed, the officer in charge of the case is responsible for evaluating the lineup to make sure that it is not unduly suggestive. If the lineup is acceptable, the system prints both a color and a black and white version.
Detective Steckel and Detective Wells admitted that a color lineup utilizing a driver’s license photo cannot be shown to witnesses before a black and white version because the color version is highly suggestive. Only if the witness first identifies someone on the black and white lineup may an officer then show the color version to the witness for identification confirmation purposes. Detective Steckel further conceded that showing the color lineup before the witness states his or her level of certainty taints the identification. He also admitted that driver’s license photos with color backgrounds “do stand out.... There’s no denying it”; and he agreed the suggestiveness of such photos is obvious and common knowledge among police officers. He explained that all Canton police officers know through training and experience not to use color lineups that include driver’s license photos. Detective Wells also conceded that a highly suggestive photo lineup could result in a misidentification.
The array here was created when the two detectives gave the photo lineup parameters to another officer, Brian Schultz, and asked him to create the lineup. Both detectives then failed to' review the lineup before it was printed to ensure that it was not unduly suggestive. Detective Steckel reviewed only the printed versions and determined that only the black and white lineup was good enough to be shown first to a witness. He readily admitted that the color lineup was unduly suggestive if shown first and he assumed everyone would know that the color version could not be shown. Detective Steckel was not present, however, when any of the four witnesses reviewed the lineups containing Legenzoffs photo and he did not know that Detective Wells showed the color lineup first. He testified that, had he been the lead investigator on the Whipple case and known that the Whipples’ identifications were made from the color lineup, he would not have sought a warrant in that case.
The -witnesses’ identifications of Legen-zoff as the suspect in the larcenies were completely dependent upon the suggestive color photo array used. The police developed no other evidence tying Legenzoff to the larcenies.
Taking all of these facts in the light most favorable to Legenzoff, a reasonable jury might well determine that, if the pros *154 ecutors had been given all of this information, the Temple arrest warrant would not have been issued and neither prosecution would have been instigated. As this court has said on more than one occasion, “the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible.” Wilson v. Morgan, 477 F.3d 326, 334 (6th Cir.2007) (quoting Gardenhire v. Schubert, 205 F.3d 303, 315 (6th Cir.2000) (alteration omitted)); Gregory, 444 F.3d at 743 (“In a § 1983 action, the existence of probable cause is a question of fact.”). The district court correctly determined that genuine issues of material fact existed for trial and that the detectives are not entitled to qualified immunity under clearly established law. Johnson, 515 U.S. at 319-20, 115 S.Ct. 2151; Malley, 475 U.S. at 344-45, 106 S.Ct. 1092; Gregory, 444 F.3d at 743-44. Because this case presents only a question of evidence sufficiency, this court lacks jurisdiction to hear an interlocutory appeal of the denial of qualified immunity. Johnson, 515 U.S. at 313, 319-20, 115 S.Ct. 2151.
II. THE MAJORITY’S FRAMEWORK IS NOT CONSISTENT WITH JOHNSON
The majority grants qualified immunity to the defendants by dismantling the totality of the circumstances underlying the probable cause determination. It does this by considering in isolation only certain facts about the photo array — the background color, the hair color, the clothing differences — to make the case for why the photo lineup was not unduly suggestive. The cases cited by the majority, finding particular lineups not unduly suggestive, reached that conclusion because the photos were substantially similar or the differences between the photos were not stark, as they were here. See, e.g., United States v. McComb, 249 Fed.Appx. 429, 440 (6th Cir.2007); United States v. Ford, 72 Fed.Appx. 342, 348 (6th Cir.2003); United States v. Knight, 382 Fed.Appx. 905, 907 (11th Cir.2010); United States v. Brennick, 405 F.3d 96, 99-100 (1st Cir.2005). But in other cases posing similar disparities, this court has decided that photo arrays were unduly suggestive. See, e.g., Jells v. Mitchell, 538 F.3d 478, 512-513 (6th Cir.2008) (holding pretrial identification procedure was unduly suggestive, but concluding that the witness identification was nonetheless reliable); Haliym v. Mitchell, 492 F.3d 680, 704 (6th Cir.2007) (same); United States v. Crozier, 259 F.3d 503, 510-12 (6th Cir.2001) (same).
The point we can draw from all of these cases is that photo lineup suggestiveness is highly dependent on the facts of each case. By parsing both the lineup and the probable cause question into component parts viewed in isolation, the majority substitutes its view of the evidence for the district court’s determination that a jury must decide the factual questions. The majority’s own analysis demonstrates this error by undertaking a detailed factual inquiry that cannot reasonably be considered an evaluation of abstract issues of law.
Such an approach is not in keeping with controlling Supreme Court law. It violates the teaching of Johnson that “determinations of evidentiary sufficiency at summary judgment are not immediately appealable.” Behrens, 516 U.S. at 313, 116 S.Ct. 834. The inquiry this court must undertake is whether the contours of the clearly established right not to be arrested ■without probable cause are “sufficiently clear that a reasonable official would understand that what he is doing violates that right.” Hope v. Pelzer, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (internal quotation marks omitted). The question is not whether “the very action in *155 question has previously been held unlawful.” Id. (internal quotation marks omitted).
Here, the contours of clearly established law on probable cause, including the use of suggestive photo arrays, is sufficiently clear that reasonable officers would understand that what they were doing violated Legenzoffs Fourth Amendment rights. And unlike the question of admissibility of an in-court identification based on a suggestive lineup where the decision is exclusively within the judge’s authority, the suggestiveness of a lineup is just one aspect of the totality of the circumstances analysis for probable cause in the qualified immunity context, and whether there was probable cause is a question commonly left to a jury. Here, the suggestive photo array is only one flaw in this police investigation. The majority does not address other fundamental problems, such as that: the photo lineup did not match the witnesses’ descriptions of the suspect; the officers’ Reports submitted in support of the arrest warrants misstated and omitted important investigative facts pertinent to the prosecutors’ decisions; and the detectives failed to develop any other evidence, beyond the lineup identifications, tying Le-genzoff to the crimes. In addition, the record contains Detective Steckel’s admission that the detectives’ actions tainted the identification process. In light of all this evidence, defendants’ minor concession on appeal that the color array was employed first during the witness identifications does not “effectively eliminate[] the triable issues of fact from the case.” Maj. Op. at 140.
In a similar interlocutory appeal, this court held it lacked jurisdiction to review the district court’s ruling that there were factual disputes requiring a trial. See Gregory, 444 F.3d at 743-44. This court agreed with the district court that a reasonable jury might find that a police officer had several reasons to believe a witness was mistaken in her identification of the suspect and that the officer lacked probable cause to arrest the plaintiff. Id. This circuit has also explained that the existence of one reasonable factual narrative supporting the existence of probable cause does not entitle an officer to qualified immunity where there are also other reasonable narratives under which no reasonable officer could conclude that probable cause existed. See Romo, 723 F.3d at 673-75. For the same reasons those cases were returned to the quintessential realm of the jury in both Gregory and Romo, this case should be returned to the district court as well.
If the analytical framework in the majority opinion were correct, it would leave few if any rights clearly established. That framework would impose upon this court the job of considering whether the facts conclusively prove a violation of a clearly established right, leaving no question for the jury and ignoring the determination of the district court that disputes of material fact remain. Such an analysis is well beyond this court’s jurisdiction to consider “neat abstract issues of law.” Johnson, 515 U.S. at 316-17, 115 S.Ct. 2151 (internal quotation marks omitted).
III. CONCLUSION
Johnson explains the critical distinction between a proper interlocutory appeal addressing abstract questions of law and the non-appealable question of whether the evidence is sufficient to prove the violation of a clearly established constitutional right. 515 U.S. at 313-17, 115 S.Ct. 2151. This court is presented with the latter case: the law on probable cause is clearly established, but genuine issues of fact exist to be tried on whether LegenzofPs rights were violated. Thus, the following state *156 ment in the majority opinion cannot be correct: “As there is no longer an issue of fact, this Court is presented only with a pure issue of law regarding the sufficiency of the evidence for probable cause.” Maj. Op. at 140. This statement improperly mixes the concepts that Johnson teaches must be kept distinct in order to determine whether an interlocutory appeal is properly brought.
In sum, genuine issues of material fact remain. As determined by the district court, they are to be resolved by the jury — the entity charged with viewing all the evidence and making credibility determinations concerning the witnesses. Case law instructs us that interlocutory appeal is not the forum for resolving these issues. This appeal should be dismissed for lack of jurisdiction and because the majority concludes otherwise, I respectfully dissent.